MALCO THEATRES, INC. *v.* McLAIN.

4-5069

Opinion delivered May 16, 1938.

*Ira J. Mack* and *Arthur L. Adams,* for appellant.

*Fred M. Pickens* and *Gustave Jones,* for appellee.

MEHAFFY, J. On August 9, 1937, John D. McLain and Elsie McLain, husband and wife, filed their complaint in the Jackson circuit court against Malco Theatres, Inc., alleging that on January 17, 1937, they attended a picture show in Newport at the Strand Theatre operated by the appellant; that upon leaving the theatre and passing along the sidewalk the appellee, Elsie McLain, was, through the negligence and carelessness of the agents and servants of appellant, tripped and caused to fall upon the walk in front of appellant's theatre, between the Strand Theatre and the fire house on Walnut street; that appellee's injury was caused by the negligence and

carelessness of appellant's colored employee, James Patton.

Appellant answered and denied every material allegation in the complaint and further pleaded in bar the contributory negligence of appellee, Elsie McLain.

There was a jury trial and a verdict in favor of the appellee in the sum of $2,500, but there was no verdict in favor of John D. McLain. Judgment was entered on said verdict, motion for new trial was filed and overruled, and this appeal is prosecuted by the appellant to reverse said judgment.

Dr. M. L. Harris testified that he had treated appellee for her injuries. She stated to witness that she had had a fall, and injured her leg. She had some bruises on her left leg and bruises on the right leg involving her knee and below. There were some bruises and abrasions, but her knee seemed to be the only place that was injured to amount to anything. Appellee's husband came to witness' office and said she was having a great deal of trouble with her knee; witness told him to put an elastic bandage on it, and the next time he saw her she had the bandage on her knee; the knee was still swollen, some on the inside. Two months ago witness put a brace on which appellee now wears. Witness took the measurement for the brace which had to be manufactured, and requires an extra kind of shoe. Witness testified at length as to the injury to appellee's knee. There was no damage to the bone structure, but a partial thickening of the cartilage. Witness said that the X-ray picture showed no evidence of damage to the bone structure except on palpitation he still felt a softening on the inside of the knee. When asked whether there was an escape of fluid, he said there was fluid there, but he did not know where it came from, it might be from the joint or from the blood stream. He stated that one usually recovers in about three months. He cannot say whether, if Mrs. McLain had immediately gotten off her foot, she could have completely recovered in not to exceed six months; he prescribed rest, but does not know whether his instructions were followed. Witness made

an X-ray picture at the solicitation of Guy Snow, manager of the theatre. He advised appellee's husband that she would have to wear the bandage and have the rest; does not know whether Dr. Stephens has the X-ray. Mr. Snow sent over and got it one day and he has not seen it since. It was agreed that the X-ray might be introduced in evidence in the absence of Dr. Harris.

Appellee testified that she is 30 years old, her father has been dead almost 16 years, and she worked as a stenographer before she got married; taught two or three terms of school in the country; was married in December, 1927. She said that when they were coming out of the theatre a little after four o'clock it was sprinkling and there was a crowd coming out, and she picked up her son and held him on the left side and started on the way to the car; the car was parked across the street near what was then Campbell's Drug Store and when she was underneath the marque, or whatever it is over the Capitol Theatre, her husband got her to wait and let him carry the baby, and before she had a chance to stop she was tripped, and when she looked around could not see anything on the right side, and when she looked to the left side the negro pulled the brush handle from between her knees. Her husband picked her up and they went to the car; she was holding her baby when she fell; she said it was so unexpected that she could not catch herself, and the side of her baby's face was hurt. She was scared at the time, afraid of pneumonia; afraid her baby would get pneumonia; she had fallen on her knees and was hurting; she was hurting all that night and on Monday felt so bad that she did not go to see the doctor, but on Tuesday she was hurting so bad that she went to the doctor and he prescribed hot towels and complete rest; she said it had to be complete rest because her knees were so sore; the doctor advised her it would be better in two or three weeks, but in that time it was not any better and she asked her husband to go and see the doctor; the doctor said it would take a little time; when she moved her knee up and down it was always painful; there was pain in walking, and she stayed off of it as much as she

could; she went to see the doctor the first part of April, and it was paining her and was getting awful and she was getting awfully worried about it; the doctor told her to put an elastic support around the knee; that it would help relieve the pain and it did for a while; she spent most of the spring and summer just lying around trying to keep the knee straight so it would not hurt; she went back to the doctor in June because it had not healed as well as she thought it should heal, and the doctor told her if it did not get better she would have to wear a brace and go on crutches; the next time she went back in July or August measurements were made for her brace, and it took about five weeks to get the shoes; on September 6, she put the brace on and has had to wear it since; she is now wearing the brace, and by request of counsel exhibited it to the jury; she has to wear it all the time to keep the knee from moving; it lessens the pain; she does not suffer pain in moving it when the brace is on; her health was good before the injury and she had suffered no other injury; she has to rest a great deal; her family has to help her with the work; before getting the brace it bothered her day and night; when she was tripped she fell on her knees on the concrete sidewalk; she did not see the brush until she was tripped and the negro pulled it from between her knees; the negro was engaged in brushing the posters there; there were posters for the picture show in front of the old Capitol Theatre. She and her husband and child left the theatre at the end of the first show; the child is an adopted child and a little past five years old; she was asked on cross-examination if she was not trying to protect her head and hat from the weather; she said she was not thinking anything about her hat; she was going along real fast with her head down next to the baby; if there were other people on the sidewalk she does not remember it; the car was beyond the Capitol Theatre building; she did not remember seeing the negro until after she fell, and does not remember what he had besides a brush; she has a vague remembrance of a paste bucket or something else; she did not get up immediately, nor until her husband came and

helped her; she said nothing to the negro boy; they were not building a new house at that time, but had completed it and moved into it the October before. Asked if she did her own work she said yes, the family helped and a great portion was neglected; she continued to do her work with the help of the family; in addition to her husband, the little boy and herself, she has her brother who is staying with her and going to school, and he helped before and after going to school. In the fall her dress was torn and her hose was torn at the knee. The bruises are at the side of the knee cap.

John D. McLain, who was one of the plaintiffs in the court below, corroborated the testimony of the appellee and testified to a conversation that he had with Mr. Snow, the manager of the theatre, and said that when he told Snow about his wife's injury, Snow said: "I think we can take care of that." He was then asked: "Did he say anything about whether they would be responsible for the injury or anything like that?" He said: "Absolutely." They were talking about the negro, Patton. The bill board is in the doorway of the old theatre. He testified that Snow told him he would be responsible for any injury by James Patton. He said, however, in further questioning, that Snow said "any of the employees."

H. R. Judy testified that he was sleeping in the balcony of the old Capitol Theatre in January, 1937; was employed in the Capitol Theatre several years; he moved away from there on August 30, 1937; at the time of the injury he was in Hot Springs; he knows that the negro boy, James Patton, worked for the theatre from September, 1936, until along in March, 1937; he helped the janitor to sweep and polish the brass, and once in a while he helped him to mop, and when the janitor was off he relieved him at the door; he heard Snow give Patton orders often; Patton often helped Buffalo put up posters; sometimes Buffalo mixed the paste and sometimes Patton did; Mr. Snow was at the theatre when the boy was doing his work; the front of the lobby of the Capitol Theatre was all walled in; they made a board to hold 24

sheet posters. James Patton left there in March, 1937; he was there when witness came back from Hot Springs; he was doing these same jobs before witness went to Hot Springs; witness has seen him often putting up posters in front of the Capitol Theatre; worked at the Strand Theatre two weeks before they opened the new building October 18, 1934; worked until January 15, 1935; that was more than two years before the accident; witness lived in the Capitol Theatre; slept there; saw Patton sweep the floors around eight and eight-thirty; after the show they would sweep the lobby, but every morning is when they clean the house and polish the brass. James Patton stood on the door at the colored balcony; whenever the janitor was out Patton relieved him. Mr. Snow never paid witness any cash; just ran errands; Everett Whidden is the projection man; witness was never employed as a projectionist; he said he was discharged; there was no complaint as to his service, he was just told that the business did not justify keeping him.

The evidence introduced by the appellant was in conflict with the evidence of appellee.

James Patton, testifying for the appellant, said that Buffalo, an employee of the appellant, told him to put up the poster in front of the old Capitol Theatre on January 17, 1937, when it was claimed he tripped Mrs. McLain. He did not receive any pay, but Buffalo would give him a pass; just slip him up to the colored seats, and witness would help Buffalo like putting up a poster; he does not know whether Judy, the white boy who testified, was around there; this witness testified that it was raining and that he was in the show, and Buffalo called him to put up the poster; Mr. Snow never told him to do anything around there; Buffalo went with him to put up the poster and showed him how to do it, and then witness pasted it up there; Buffalo did not stay until he pasted it up; he went walking back toward the Strand Theatre and witness pasted it up; he had some paste in a bucket and a brush; the handle of the paste brush was broken and witness had a little old round handle in it. This witness testified that he was pasting up the sheet and a

lady came running down the street and fell over the paste brush; that the sidewalk was six or seven feet wide. The poster he was putting up was for advertising a picture at the Strand.

Buffalo testified that he had put up a 24 foot poster that morning and the rain caused the paste on it to come loose at the top, and Mr. Snow came to the head of the stairs and hallooed to him, telling him it was loose; when Mr. Snow told him to fix the poster he got his stuff out and went down and told James Patton to go down there and fix it up; Patton used a ladder, paste brush and a bucket; the brush was an ordinary paste brush used for that purpose on the street; the handle was about six feet long; Patton helped witness put up posters two or three times.

Guy A. Snow testified that he was manager for the Strand Theatre and introduced a sketch drawn by himself showing the location of the Strand Theatre, the cafe, an auto store and billboard in front of the Capitol. This witness, however, also testified that after the first show witness was by the front door holding it back for people to walk out; he saw both Mr. and Mrs. McLain and spoke to them as they went out; asked whether he could have seen down there where the poster was from where he was at the time, he said when he first walked out he looked down there and saw the edge of the sheet flopping in the wind; he saw the thing was loose and told Buffalo to get his bucket and brush and go up and fix it; does not know whether Mrs. McLain came out before he told Buffalo to fix it or afterwards. When asked whether he could have seen James Patton if he had looked in that direction, witness said that if he had not already put the sheet up he could have.

Physicians testified on behalf of the defendant, and there is some conflict between their testimony and that of the physician testifying for the appellee.

John L. McLain, a cousin of John D. McLain, testified that he heard Patton say that he scrubbed the floor and the glass work, washed windows and posted up bills and sometimes took up tickets at the negro entrance.

H. R. Judy also testified that he heard Patton say that he helped Buffalo clean the place and put up posters and relieved him at the door. Heard a conversation between Mr. Jones and a colored boy about Mrs. McLain being hurt; heard him say that he hung up posters, polished knobs and stuff like that, and that he got admission to the show.

Appellant contends that the court erred in refusing to direct a verdict against the appellee and in favor of the appellant, because, he says first, the negro, Patton, never was employed by the appellant; and second, because it is alleged the evidence shows the appellee was guilty of negligence causing the accident and injury complained of. It is true that James Patton was not regularly employed by appellant, and the evidence is in conflict as to whether appellant ever gave him orders or employed him. There is some evidence tending to show that he was employed by the appellant to do certain jobs. There is no dispute about Buffalo's being employed. The appellant concedes that Buffalo was in its employ, and the evidence clearly shows that the poster on the front of the theatre building had become loose, and Mr. Snow, the manager of appellant, according to his own testimony, ordered Buffalo to paste it up. Snow was standing where he could see the poster, and knew it was down, and gave orders to Buffalo to put it up. Buffalo and James Patton went down to the place together, and in going down passed Snow, and he must have seen them. Snow himself says that he was at the door when the first show closed. He saw Mr. and Mrs. McLain come out of the show and walk down the sidewalk; he knew that the poster was being pasted up. The undisputed evidence is that Patton assisted Buffalo, and that for this service Buffalo passed him into the show.

There is some conflict in the authorities as to whether a master is liable for the acts of one employed by a servant of the master.

"The weight of authority holds that the fact that the master cannot be held liable under the doctrine of *respondeat superior* does not necessarily absolve him

from liability on other grounds, although the decisions are not in accord as to the circumstances which will impose liability.'' 39 C. J. 1272.

It was said by the Supreme Court of Minnesota: ''We have no disposition to question the soundness of the rule that under the doctrine of *respondeat superior* the master is not, generally speaking, responsible for the negligence of another, not his servant, or the application of this doctrine to a case where the negligent act is done by one without authority employed by the servant to assist him, and not done in the presence of the servant and with his consent. But where the servant is present and consents to the performance of the act by the assistant in a negligent manner, we think the negligence is that of the servant, and the master is responsible.'' *Geiss* v. *Twin City Taxi Cab Co.*, 120 Minn. 368, 139 N. W. 611, 45 L. R. A. N. S. 382.

In the instant case, according to the evidence, Buffalo, the servant of appellant, was ordered to paste up the poster and he directed Patton to go with him and paste it up. He had done this on other occasions. Moreover, the work was done a short distance from Snow, where he could see it; in fact he first saw it and called Buffalo and directed him to do this work, and if Buffalo, in carrying out the orders of the master, employed Patton to do the work, and Patton did it negligently causing the injury, this was the negligence of the servant, Buffalo, and the master is liable.

The New York court held that where a servant, without the knowledge of the master or express authority, was ordered to do certain work and a third party volunteered to assist him, and where the evidence showed that the servant and the volunteer were engaged in shoveling snow from the roof when the accident occurred, and the injury was produced by ice being thrown on the head of deceased, that the accident was caused by the negligence of the servant, and that the master was liable. The court, among other things, said:

''I am of the opinion that, under the conceded facts of the case, it was not error to refuse to charge as re-

quested, and that it was immaterial, as affecting the defendant's liability, whether Fagan or Cashan actually threw that parcel of the snow and ice being removed from the roof which occasioned the fatal injury. In either view, it was, substantially, the act of Fagan, who had been charged by the defendant with the duty of clearing the roof. The defendant had given him general directions to throw the snow from the roof of his house, enjoining no caution and suggesting no mode of doing it, to prevent injury; nor placing the servant under any restriction against procuring aid in the work. I see not, therefore, why he was not entitled to procure aid, and invested with the power of exercising his own judgment as to the mode of doing the work." *Althorf* v. *Wolfe,* 22 N. Y. 355. See, also, *Simons* v. *Monier,* 29 Barb. 419. *Ice Service Co.* v. *Forbess,* 180 Ark. 253, 21 S. W. 2d 411; *Booth & Flynn* v. *Price,* 183 Ark. 975, 39 S. W. 2d 717, 76 A. L. R. 957.

This court has held that when the servant of the master allows a third party to perform his duty that if he is negligent and his negligence causes injury, it is the negligence of the servant and the master is liable. *Federal Compress & Warehouse Co.* v. *Jones,* 180 Ark. 476, 21 S. W. 2d 857; *Tchula Co-op. Store* v. *Quattlebaum,* 176 Ark. 780, 4 S. W. 2d 919.

We think under the evidence the master was clearly liable on other grounds than under the doctrine of *respondeat superior.* We think, however, the evidence is sufficient to warrant the jury in finding that the negro, James Patton, did work as a substitute for Buffalo with the master's knowledge and consent.

The evidence shows conclusively that James Patton was on the sidewalk using a brush with a handle about six feet long, and evidently paying no attention to persons traveling on the sidewalk because he testified himself that he did not see Mrs. McLain before she struck the brush. The undisputed proof shows that she fell over the handle of the brush, and after she had fallen the brush handle was between her knees.

We think the evidence set out above is ample to warrant the jury in finding that Patton was guilty of negligence.

It is contended, however, that Mrs. McLain was guilty of contributory negligence. All the witnesses testify that it was either sprinkling or raining. There is a conflict as to how heavy the rainfall was. Mrs. McLain had left the theatre, and picked up her little boy, holding him on her left side, and was walking down the sidewalk and tripped and fell over the brush handle, and we think the evidence was sufficient to submit this question of her contributory negligence to the jury, and its finding, both as to the negligence of appellant and contributory negligence of appellee is conclusive here because there was substantial evidence to support the verdict.

When the appellee was being examined on her direct examination she was asked to tell exactly how the injury occurred, and what treatment was given, and she answered: "And then, on the 14th day of June I went back because it hadn't healed as well as we thought it should heal and the doctor told me then if it didn't do better, why, I would have to wear a brace and go on crutches. And then the insurance company wanted an X-ray, I think——." Here the witness was interrupted and the appellant objected and moved the court to declare a mistrial. The court said to the jury: "That is withdrawn from you, gentlemen of the jury. Don't consider that statement as any evidence in this case. It is wholly improper."

The attorney for the appellee thereupon stated: "We did not invite that and we ask the court to instruct the jury that it is incompetent." Whereupon, the attorney for the appellant stated: "The defendant desires to except to the ruling of the court in refusing the motion of defendant for a mistrial of this cause, and the defendant again renews the motion for a mistrial," and the court said: "Let the motion be overruled."

Appellant calls attention to the case of *Peay* v. *Panich,* 191 Ark. 538, 87 S. W. 2d 23. In that case the at-

torney objected to a question about statement having been signed before an insurance adjuster, and insisted that he had a right to ask the witness, and the court said: "Gentlemen, I think it highly improper to bring in any insurance company in your examination. Ladies and gentlemen of the jury, you will not consider in this case the statement of the attorney that this statement the witness gave was to an insurance adjuster." The court then said: "We have several times held that questions not dissimilar to the one propounded by appellant's counsel were improper and, if pursued, highly prejudicial." The court held in that case that there was no error committed by the trial court.

In the case of *Terry Dairy Co.* v. *Parker,* 144 Ark. 401, 223 S. W. 6, where a similar question was asked, the court stated: "As the court has already held, that part which relates to the insurance, the witness will not be allowed to answer." This court held that the prejudicial effect, if any, of the improper question, was removed by the decided ruling of the court holding that the question was incompetent.

In this case the record shows clearly that the attorney for appellee did not ask anything about insurance, and that the appellee, in answering the general question, made some statement about the insurance adjuster. She was immediately interrupted, and the court in no uncertain terms told the jury that they could not consider it. If there was any prejudicial effect, what the court said removed it, and there was no error in the court's refusing to grant a mistrial.

It is next contended by appellant that the court erred in refusing to give instructions Nos. 3 and 4 requested by it. The instructions refused by the court were fully covered in instructions given by the court, and the instructions of the court fully and fairly submitted the issues to the jury. There was no error in its refusal to give these instructions.

It is finally contended that the verdict is excessive, there being no evidence, it is said, in the record to justify the amount of the verdict. The injury occurred in

January, 1937. The case was tried in November, 1937, about ten months after the injury occurred. Appellee was still wearing a brace and still suffering from the injury. The evidence as to the injury and the continued suffering by appellee, and the inconvenience and interference with her usual work, when considered warranted the jury in returning a verdict for the amount they did. There is no rule by which we can measure pain and suffering, and as testified to by the physicians, one cannot see pain, but must depend largely on the statement of the person suffering. There can, however, be no doubt about appellee's suffering and about her having to wear a brace and at the time of the trial she had been treated for ten months and her knee was still not well; and while the verdict appears to be large, we do not think it is excessive.

The judgment of the circuit court is affirmed.

GRIFFIN SMITH, C. J., and SMITH, J., dissent from the action of the court in overruling the motion for rehearing.